IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ASFA MALIK,

    Plaintiff,

v.

ADDISON GROUP,

    Defendant.

Case No. 21-cv-6362

## COMPLAINT

Plaintiff ASFA MALIK ("Plaintiff"), by and through her attorneys, alleges the following against Defendant ADDISON GROUP ("Defendant" or "Addison").

## INTRODUCTION

1. This is an action for retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981").

## JURISDICTION AND VENUE

2. Jurisdiction is based on 28 U.S.C. §1331 and 1343.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because the unlawful employment practices alleged in this Complaint occurred in the Northern District of Illinois.

## THE PARTIES

4. Plaintiff, a resident of Cook County, Illinois, was employed by Defendant from August 3, 2020 until her termination on January 27, 2021.

5. Defendant is a professional services staffing and consulting agency headquartered in Chicago, Illinois which places specialized candidates in IT, Finance and Accounting, Healthcare, Human Resources, Engineering, and Marketing, among other fields. https://addisongroup.com/. Defendant has over a thousand employees and 25 offices across the country.

## FACTUAL ALLEGATIONS

**Employment History**

6. Plaintiff, a highly experienced and dedicated leadership development executive, was hired by Defendant on August 3, 2020 to serve as its Vice President of Learning and Development ("L&D"). During a lengthy interview process, including meetings with Tom Moran, President and CEO, and Steve Wolfe, Executive Vice President of Operations and Administration, who would become her direct supervisor, she impressed each of them with her knowledge and leadership style.

7. Mr. Moran, in particular, was hopeful that Plaintiff would be a change agent to improve what he acknowledged was an insufficiently diverse and inclusive culture at Addison Group. In order to empower her to explicitly address these issues, Plaintiff was given the additional responsibility of leading Defendant's Diversity, Equality and Inclusion ("DEI") initiative upon her hire.

8. Plaintiff was enthusiastic about her DEI role and immediately set to work identifying areas for improvement, including a lack of diversity – the staffing side of the business was approximately 98% white – and inappropriate comments employees and supervisors frequently made about women, black people, religious and ethnic minorities, and the LGBTQ+ community. Her task became complicated, however, when she learned that she would be co-leading the DEI initiatives with Peg Buchenroth, Addison's Senior Vice President of Human

Resources, whose department had been the source of many of these problems and had been particularly resistant to change.

9. The irony of placing HR in charge of cleaning up these problems was not lost on employees and sent a very mixed signal about Defendant's commitment to truly change the culture. When the partnership between DEI and HR was announced, Addison employees even commented on how counter-productive it was, given that HR, under Ms. Buchenroth's leadership, had ignored employee complaints about these very issues. As one employee on the L&D team put it, replying anonymously to a company-wide Engagement Survey, "DEI paired with HR is a slap in the face."

10. Plaintiff met further resistance from her own supervisor, Mr. Wolfe, who failed to support her efforts to improve the culture, chastising her when she requested data on Defendant's demographics and claiming that she did not "have authority to ask for that."

11. Despite this internal resistance to change, Plaintiff took her new role very seriously and moved full steam ahead, creating a DEI taskforce as well as other initiatives to get buy-in from leadership, in addition to her L&D responsibilities. During this time, she received consistently positive feedback from her employees, colleagues, and superiors, including a positive performance review, delivered on January 11, 2021, in which Mr. Wolfe praised her for being "extraordinarily talented" and expressed his confidence that he had "no doubt she would be successful in the role."

12. Plaintiff was also regarded highly by Mr. Moran, who complimented her in a January 17, 2021 email for a job "well done" and wished her "[g]ood luck accomplishing [her] 2021 goals."

**Plaintiff's Protected Activities**

13. As Defendant's leader of DEI, Plaintiff began receiving complaints from employees about a persistent culture of racism. Each time these issues were brought to her

attention, she elevated them to her supervisor, Mr. Wolfe, and/or her colleague, Ms. Buchenroth.

**(1)     October 2020 Call with Steve Wolfe**

14.     The most alarming example of this racist culture was a documented system, described in a document entitled "Candidate Ranking Guidelines," that relied on blatantly racist stereotypes for evaluating healthcare candidates for placement at Defendant's client organizations. Under the Candidate Ranking Guidelines, a candidate's ranking would be downgraded to the point that Addison would refuse to work with them based on factors such as "AAVE" (African-American Vernacular English, e.g., Ebonics), "slang," "questionable grammar," slight or thick accent, "questionable hair," and "gold teeth," regardless of whether the candidates were otherwise qualified and without regard for the requirements of the job.

15.     The Candidate Ranking Guidelines, which were created by a branch manager and distributed to all healthcare recruiters by the Senior Vice President and President of the Health Care Division, were so integral to Defendant's operations that recruiters were encouraged to print them and have them readily available at their workstations so that they could reference them whenever they conducted an interview.

16.     Plaintiff first became aware of the Candidate Ranking Guidelines on October 15, 2020 when the document was brought to her attention by an Addison Group health care recruiter. Deeply disturbed that Defendant was using such blatantly racist criteria, much less that this system had been endorsed by members of senior leadership and distributed widely, likely affecting the job prospects of multiple job candidates of color, Plaintiff immediately brought it to Mr. Wolfe's attention.

17.     To her surprise, Mr. Wolfe seemed disinterested and tried to avoid any acknowledgement of the issue at all. Not only was he reluctant to acknowledge the document in

4

writing or via video-conference, but in a phone call later that day, he told Plaintiff not to send him the document, implying that he did not want to be accountable for even seeing it. He also claimed that the IT department had already been instructed to remove the document from all servers and the Learning Management System ("LMS"), where all training materials are kept.

18. However, upon information and belief, at no point following this incident did Defendant take any steps to disavow the guidelines or advise its employees that they were inappropriate and no longer in effect. Moreover, on information and belief, none of the managers involved in creating and distributing these guidelines to Addison Group employees was disciplined or even counseled for their roles in such a racist practice.

**(2)  January 2021 Meetings with Peg Buchenroth**

19. On January 20, 2021, Plaintiff received an emotional email from a former employee describing an intolerable environment of racism, Islamophobia, and homophobia during her tenure at Addison Group, including pointed comments that had been made to the employee, a member of the LGBTQ+ community, about her sex life and other insensitive comments, including calling a trans woman "it," joking that Middle Easterners are terrorists, and belittling the Black Lives Matter movement after the death of George Floyd. The email, which was also sent to Ms. Buchenroth and the Senior Vice President of Health Care, attached a video posted on social media by an Addison Group sales manager making transphobic statements.

20. Plaintiff immediately contacted Ms. Buchenroth requesting a meeting to address these issues, stating in an email, "I am very disturbed by this note and a few other examples of racism." The following day, Plaintiff met with Ms. Buchenroth to discuss the email and other examples of discrimination that had been recently reported to her, including comments made by Addison Group HR employees about black people being "low class."

5

21. Plaintiff also told Ms. Buchenroth in this meeting that one of her direct reports, a young woman, reported that she had been sexually harassed during a work trip in Mexico in 2019 when Addison's President of Finance and Accounting grabbed her inappropriately as she was getting out of a pool, while other members of senior leadership, including Mr. Wolfe, laughed and clapped.

22. The victim told Plaintiff that she had reported this sexual harassment to Ms. Buchenroth on at least two earlier occasions, before Plaintiff had even been hired, but each time her concerns had been "swept under the rug." Plaintiff, too, had tried to raise this with Ms. Buchenroth once before, immediately after her direct report told her about it, but before she had all the details. But rather than take the complaint seriously and initiate an investigation at that time, Ms. Buchenroth simply brushed it off as "before my time."

23. In a follow-up video call with Ms. Buchenroth on January 25, 2021, Plaintiff circled back to some of the issues she had raised during the January 21 meeting and also informed Ms. Buchenroth of her concerns abour the Candidate Ranking Guidelines document, which she had first raised back in October but had never been investigated.

24. Ms. Buchenroth claimed that the document was outdated and had been created years ago, even though Plaintiff was able to confirm that it had been edited and sent to the L&D team to put on the LMS as recently as 2019. Plaintiff also reiterated in this call that Mr. Wolfe not only failed to intervene in the sexual harassment incident in Mexico when he witnessed it, but that he had also participated in the jeering and clapping. During both of these conversations, and in emails, Plaintiff stressed the seriousness of these issues and the need to escalate them to Mr. Moran so that they could be properly addressed.

6

**Plaintiff's Termination and Defendant's Alleged Reasons**

25. Before Plaintiff could raise these issues to Mr. Moran, however, and just one day after she made her final complaint by forwarding the Candidate Ranking Guidelines document to Ms. Buchenroth, she was asked to meet with Ms. Buchenroth and Mr. Wolfe. In that January 27 meeting, Ms. Buchenroth and Mr. Wolfe informed her out of the blue that they had made the decision to terminate her.

26. Plaintiff was completely blindsided by this announcement given the positive performance review Mr. Wolfe had given her just two weeks prior, and comments from Mr. Moran himself on January 17, complimenting Plaintiff for a job "well done" and referring positively to her work in the coming year, all of which presumed her future employment with Addison.

27. At the time of the termination, the only reasons cited were: (1) an alleged lack of support from vertical leaders in Sales, (2) an alleged lack of ownership over poor engagement survey results, and (3) negative feedback about Plaintiff from a former employee during her exit interview. As detailed below, none of these reasons can withstand scrutiny.

**(1) Allegedly Poor Relationship with Sales Leadership**

28. Contrary to Ms. Buchenroth's assertion during the termination meeting that Plaintiff had poor relationships with members of sales leadership, no indication of this was ever given to Plaintiff from the leaders themselves, with whom she had positive working relationships. The only feedback she had previously gotten on this point was from Mr. Wolfe, who told her during her January 11, 2021 performance review that she should reach out and involve these leaders more in L&D initiatives.

29. Plaintiff was surprised to hear this at the time, as she had been given no prior guidelines from Mr. Wolfe or the leaders themselves on how often meetings should take place, and she already had one-on-one meetings with each of them and attended the monthly meetings

7

with vertical leaders. Following this feedback, however, Plaintiff immediately set to work to involve those leaders even more, reaching out the very same day to schedule meetings.

30. Despite Plaintiff's efforts, the sales leaders seemed unengaged and even canceled meetings that she had set up in an effort to strengthen their relationships. When she brought this to Mr. Wolfe's attention, he did not offer any additional feedback or support or cite any other shortcomings in this area, nor did he give any indication that her job was jeopardy.

**(2) Alleged Lack of Ownership of Engagement Survey Results**

31. Ms. Buchenroth and Mr. Wolfe also claimed that Plaintiff had failed to take ownership of the results of the Engagement Survey, which had been conducted in October 2020, just two months after Plaintiff's hire, to solicit feedback from non-leadership employees across Addison about their satisfaction with various aspects of the workplace culture.

32. The L&D results, which were presented to Plaintiff and Mr. Wolfe in December, were mixed, likely influenced by Defendant's decision to unnecessarily require employees to come into the office during the pandemic without adequate contact-tracing or testing. Employees were also adrift due, in part, to a void in leadership in the months leading up to Plaintiff's hire, during which time most of the L&D team reported to several different managers.

33. Although most, if not all, of the comments were about the team's culture before Plaintiff's arrival and none had to do with her personally, she took swift action to address the issues that had been uncovered. She had several exchanges with Addison Group's Manager of Organizational Development about the results and how to address them before scheduling a formal readout to the team.

34. The readout, which took place on January 12, 2021, was attended by Mr. Wolfe, the Manager of Organizational Development and all of Plaintiff's direct reports. Prior to the

meeting, Mr. Wolfe sent an email to the team to emphasize the purpose of the meeting:

> We are not getting together as a team to point fingers, make excuses, or place blame in any way. Our focus will be on the why behind the results, and then to be able to shift our thinking to the how and what in order to help us get realigned and purposeful with what we need to do together to learn, grow and improve as a team and as a company.

35. The meeting went well, with employees candidly sharing some of their own experiences and frustrations and brainstorming about how to improve the team's culture going forward.

36. Plaintiff sent out an email to the team following the readout praising the level of engagement and expressing optimism for concrete plans to address the issues that had been raised. Apparently, Mr. Wolfe was pleased with Plaintiff's efforts and leadership at that point, because he followed up on Plaintiff's email stating, "Asfa could not have stated it more perfectly. Thank you, thank you, thank you for your openness and feedback, and willingness to help us get to the why behind the scores."

37. Reference to the survey results were also conspicuously absent from Plaintiff's performance review, even though Mr. Wolfe had been aware of the results for a month when he drafted and delivered the review.

**(3) Alleged Negative Comments in Another Employee's Exit Interview**

38. The last reason that Ms. Buchenroth and Mr. Wolfe gave for Plaintiff's termination was alleged negative feedback about Plaintiff in an exit interview by a former employee. Although they were deliberately vague about who gave the exit interview[1] and what was said, Plaintiff was able to infer that the employee was a very junior member of her team who resigned in December

---

[1] Ms. Buchenroth first claimed that this feedback had come from multiple exit interviews, but Defendant has since acknowledge that Employee 1 was the only one of Plaintiff's team members who gave negative feedback about Plaintiff during an exit interview.

2020 (hereinafter "Employee 1").

39. On its face, it is not credible that such feedback would have been a reason to terminate Plaintiff. Although Employee 1 did cite some dissatisfaction with Plaintiff in her exit interview, which was produced as part of Plaintiff's personnel file after her termination, she also criticized other members of leadership, including Mr. Wolfe, none of whom suffered any repercussions.

40. Further, when Employee 1 announced her resignation, she stated that she had started her job search months before Plaintiff even began her employment at Addison, and at no point had Employee 1 ever reported directly to Plaintiff in the few short months they overlapped. When they did work together, their interactions were positive, and Employee 1 even told Plaintiff (unsolicited) that she was a "bold" and "courageous leader" shortly before her resignation.

41. Even so, it does not make sense that a vague criticism from such a junior employee would be a reason to terminate Plaintiff, especially since Mr. Wolfe himself made no secret of his low regard for Employee 1 and openly criticized her to Plaintiff. Indeed, when Employee 1 informed Plaintiff that she had another job offer, Mr. Wolfe specifically declined to match the offer and expressed that he was glad to be rid of her, calling her a "mean girl."

42. More importantly, if Employee 1's alleged exit interview feedback had truly been consequential, Mr. Wolfe and Ms. Buchenroth had ample opportunity to address any negative comments with Plaintiff back in December, more than a month prior to her termination. However, no such conversation ever took place, no investigation was conducted, and negative feedback on this topic was conspicuously absent from Plaintiff's performance review, which occurred several weeks after the exit interview.

**Damaging Post-Termination Activities**

43. After Plaintiff hired lawyers to challenge the legality of her termination, Defendant constructed an entirely new narrative to retroactively justify her termination and began a campaign to smear Plaintiff's reputation outside of Addison Group.

**(1)     Papering of Plaintiff's Personnel File**

44. On February 19, 2021, two weeks after Plaintiff's lawyers put Defendant on notice of "potential legal claims," Defendant produced several pages of notes from interviews Mr. Wolfe had purportedly conducted with some of Plaintiff's subordinates, which Defendant cited as evidence of negative feedback about her.

45. None of these notes had ever previously been seen by or discussed with Plaintiff. Some of these notes (though not all) were critical of her leadership and accused her of making inappropriate comments. None of these alleged concerns were ever brought to Plaintiff's attention, no investigation about them was conducted prior to her abrupt termination, and the feedback was never referenced at all during the termination meeting.

46. Moreover, of the specific complaints raised, all of them were either taken grossly out of context or fabricated altogether and came close on the heels of negative feedback Plaintiff had given to employees that had been underperforming, all of which raised serious questions about their credibility and reliability.

47. Perhaps most strikingly, these comments were also completely at odds with the direct feedback that Plaintiff received from many of the *same people* following her termination, including:

- "you were making a difference. You left this place better and I thank you for that. Just wish we could of [sic] finished what you started."

- "I appreciated you."

- " . . . you brought a lot of value to the team."

- "Holy shit! . . . we are at a great loss without you."

- "having you on this team for a short while provided immense value. . . . positive impact you started to bring to this team."

- "Thank you for being the boss woman you are, You have already had such an impact on my life and I'm forever grateful. . . . I really appreciate you going to bat for us and I'm really sorry it cost you your job."

- "You are beyyyyyond Addison and such a wonderful leader."

- "I was just getting super pumped about what we were going to build together. What happened? Wish you the best, you're a class act and Addison will be worse off without you as a part of it."

48. Considering the gross inconsistencies between these employees' lavish praise of Plaintiff and their alleged criticisms of Plaintiff in the January 2021 interviews, taken together with their motives to discredit her once she became critical of their performance, Defendant appears to have been unjustifiably eager to find a reason to terminate her.

49. Defendant's reliance on the January 2021 interviews is further flawed in that it fails to consider that several of those interviews offered extremely positive feedback about Plaintiff, including a subordinate who said she was "very happy Asfa is here. She is bringing structure," and another who said she was "… supportive of Asfa."

50. Further calling into question the legitimacy of these complaints is the fact that they were never raised in Mr. Wolfe's regular skip-level meetings with both of Plaintiff's direct reports who supervised the rest of Plaintiff's team. If these employees and their direct reports had such serious concerns about Plaintiff's leadership, it would be reasonable to expect that these issues would have been raised much earlier and given Mr. Wolfe an opportunity to incorporate such

feedback into Plaintiff's January 11, 2021 performance review. But again, no reference to inappropriate comments or poor leadership was made in that review.

51. To the contrary, Mr. Wolfe specifically complimented Plaintiff's leadership in that review, noting, "You took on the challenge of beginning coaching and developing quickly. That side of the business is your strength..."

52. Indeed, Mr. Wolfe had acknowledged on several occasions, including during the interview process, that there were known problems with the L&D team, and both Mr. Wolfe and Mr. Moran told Plaintiff that she could restructure the team however she wanted.

53. Mr. Wolfe took particular issue with one of the employees who had been most critical of Plaintiff, whom he viewed as a poor performer, and had again encouraged Plaintiff in her performance review to think about replacing that employee and others. For Mr. Wolfe to later try to build a case against Plaintiff based on the alleged comments of disgruntled employees complaining about new job expectations is disingenuous.

**(2)   Attempts to Publicly Discredit Plaintiff**

54. Following Plaintiff's retention of counsel, Defendant further tarnished Plaintiff's reputation by directing its public relations firm to remove any reference to Addison Group in connection with published interviews given by her during her tenure with Defendant, even though most of the articles Defendant now seeks to revise were published while Plaintiff was employed and legitimately speaking in her capacity as Defendant's Vice President of Learning and Development. The implication of Defendant's post-termination attempt to distance itself from Plaintiff and cast a shadow over her termination was that she engaged in some wrongdoing or is otherwise no longer credible, negatively impacting her reputation in her field.

55. Defendant has also made various bad faith statements to the Illinois Department of Employment Security ("IDES") in response to Plaintiff's legitimate claim for unemployment benefits. Defendant first claimed that Plaintiff was ineligible for benefits, claiming she had been terminated for "misconduct." When the IDES rejected that contention and awarded Plaintiff benefits regardless, Defendant then claimed that Plaintiff's claim was "fraudulent," forcing her to prove her identity in order to restore her benefits.

## PROCEDURAL REQUIREMENTS

56. Plaintiff filed a timely charge with the Equal Employment Opportunity Commission, attached hereto as Exhibit A, which encompasses the allegations contained in this Complaint.

57. The EEOC issued a Notice of Right to Sue to Plaintiff upon request, attached hereto as Exhibit B, which was received on October 19, 2021.

58. This Complaint is being filed within 90-days of Plaintiff's receipt of the EEOC's Notice of Right to Sue. Accordingly, Plaintiff has met all procedural prerequisites to bringing the present action.

## COUNT I
## RETALIATION IN VIOLATION OF TITLE VII
## 42 U.S.C. §2000e-3(a)

59. Plaintiff realleges and incorporates by reference the allegations set forth above as though fully stated herein.

60. Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from retaliating against an employee for engaging in statutorily protected activity. 42 U.S.C. §2000e-3(a).

61. Plaintiff's complaints to management about Defendant's racist practices and incidents of transphobia and sexual harassment constitute legally protected activity.

62. Defendant terminated Plaintiff on January 27, 2021 in retaliation for engaging in statutorily protected activity, in violation of the anti-retaliation provisions of Title VII. 42 U.S.C. §2000e-3(a).

63. As a result of Defendant's unlawful retaliatory conduct, Plaintiff has suffered pecuniary and emotional damages.

64. Defendant engaged in the retaliatory conduct described herein with malice or reckless indifference to Plaintiff's federally protected rights.

## COUNT II
## RETALIATION IN VIOLATION OF SECTION 1981
## 42 U.S.C. §1981

65. Plaintiff realleges and incorporates by reference the allegations set forth above as though fully stated herein.

66. Section 1981 prohibits an employer from retaliating against an employee for complaining of race discrimination. 42 U.S.C. §1981; *CBOCS West v. Humphries*, 553 U.S. 442 (2008).

67. Plaintiff's complaints to management about Defendant's racist practices constitute legally protected activity.

68. Defendant terminated Plaintiff on January 27, 2021 in retaliation for engaging in statutorily protected activity, in violation of Section 1981.

69. As a result of Defendant's unlawful conduct, Plaintiff has suffered pecuniary and emotional damages.

70. Defendant engaged in the retaliatory conduct described herein with malice or reckless indifference to Plaintiff's federally protected rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A. Enter a judgment that the conduct of the Defendant alleged herein violates the laws of the United States;

B. Award Plaintiff all back pay, front pay, benefits, pre-judgment interest, and any other remuneration to which she would have been entitled but for Defendant's unlawful conduct;

C. Award Plaintiff compensatory and punitive damages;

D. Award Plaintiff the costs of this action, including reasonable attorneys' fees, expert fees, and any other costs reasonably incurred in the litigation of this matter;

E. Award Plaintiff such other and further equitable, injunctive and legal relief as this Court finds necessary and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,

ASFA MALIK

By  *s/Brenda H. Feis*
One of Her Attorneys

Brenda H. Feis
Elisabeth G. Mustoe
FEIS GOLDY LLC
161 N. Clark Street
Suite 1600
Chicago, IL  60601
(312) 523-2200
bfeis@feisgoldy.com
emustoe@feisgoldy.com

November 29, 2021